IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAYOR & CITY COUNCIL OF          *
BALTIMORE
                                 *
          Plaintiff
                                 *
          vs.                        CIVIL ACTION NO. MJG-08-3319
                                 *
PRICELINE.COM INCORPORATED,
et al.                           *

          Defendants            *

*        *        *        *        *        *        *        *        *

MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT AND SANCTIONS

     The Court has before it Defendants Travelocity.com LP's and

Site 59.com LLC's Motion for Sanctions and Motion for Summary

Judgment [Document 200] and the materials submitted relating

thereto.  The Court has held a hearing and has had the benefit

of the arguments of counsel.


I.    BACKGROUND

     In this case, Baltimore City (the "City") has sought to

apply the transient occupancy tax (the "Occupancy Tax") imposed

by the Pre-2007 and current version[1] of Article 28 of the

Baltimore City Code (the "Ordinance") to transactions conducted

by online travel companies ("OTCs").  All Defendants other than

Defendants Travelocity.com LP and Site 59.com LLC, (collectively

"Defendants" or "Travelocity") have settled with the City.

_____
[1]    The City amended the Ordinance in various respects in 2007,
2010, and 2012.

The Court has held that the current version[2], but not the Pre-2007 version, of the Ordinance is applicable to Travelocity. See Mem. & Order Re: Motions for Summ. J. [Document 167].

A residue of substantive issues needing resolution prior to the entry of Judgment is addressed herein. In addition, the Court addresses Defendants' request for sanctions pursuant to Federal Rule of Civil Procedure 37[3] for the City's alleged failure to satisfy its damage-related discovery obligations.

II.  SUMMARY JUDGMENT

The substantive matters presented by the instant motion are:

1.  The effect of a check presented by Travelocity to the City by letter dated December 17, 2010;

2.  Whether interest accrues only on tax due or on tax plus penalty due;

3.  Whether the penalty is applied only to tax due or to tax plus interest due;

4.  Whether the penalty rate is based on the version of the Ordinance in effect on the date the tax first became overdue or on the later date of a delinquency payment; and

5.  The treatment of "breakage" transactions.

---

[2]  That is the version that became effective on August 14, 2007.
[3]  All Rule references herein are to the Federal Rules of Civil Procedure.

A.   Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings and supporting documents show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The well-established principles pertinent to such motions can be distilled to a simple statement. The court may look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

There appear to be no genuine issues of material fact with regard to any of the issues discussed herein.


B.   The Check Issue

On July 15, 2010, the City sent a letter to Travelocity.com LP and Travelocity.com Inc. providing a calculation of "unpaid [Occupancy] taxes, penalties and interest" for a period through June 25, 2010, and demanding payment by July 25, 2010 (the "July

3

15 Letter"). [Document 192-4] Ex. 15, at 1. The July 15 Letter represented that the calculations were to "facilitate [Travelocity's] review of the amounts due" and advised that Travelocity should pay the amount due to "avoid further interest charges and penalties." Id. at 1-2.

On December 17, 2010, approximately five months later, Travelocity sent a letter to the City (the "December 17 Letter"), with a spreadsheet showing its calculations of Occupancy Tax owing and a balance due of $114,241.56, as well as a check for that amount. [Document 192-1] Ex. 5. In the December 17 Letter, Travelocity stated that the check "represents 100% of the taxes, penalties, and interest calculated in accordance with [Travelocity's view of the Ordinance] . . . for the time period 8/14/07 to 11/30/10" and stated that Travelocity had decided "to comply on a going-forward basis" with the Ordinance, though it "still has doubts" about the applicability of the 2007 Ordinance to its business model. Id. at 1.

By letter dated January 5, 2011, the City, through counsel, responded to Travelocity's December 17 Letter (the "January 5 Letter") confirming receipt of the check, but stating that the City "will not accept your payment as full satisfaction and accord of Travelocity's liability to the City since August 2007." [Document 192-1] Ex. 6, at 1. The City explained that

its "calculations (as reflected in the City's [July 15 Letter])
and Travelocity's calculations are substantially different."
Id.  The January 5 Letter concluded:

> Please let us know if you would like us
> to either a) return the check to you, or b)
> deposit and credit it towards the amounts
> due (amounts which are increasing and which
> will be determined in the ongoing litigation
> proceedings).

Id.

Travelocity responded by letter dated January 11, 2011 (the
"January 11 Letter"), stating that "Travelocity never asked the
City" to accept the check as a full satisfaction and accord of
Travelocity's liability since August 2007.  [Document 192-2] Ex.
7, at 1.  Rather, the point of the December 17 Letter was "to
narrow the dispute between the parties by paying the City what
is allegedly owed in taxes, interest and penalties under the
City's amended ordinance effective August 14, 2007."  Id.
Travelocity goes on to state that if the City contends
Travelocity owes more in "alleged taxes for the time period" or
"miscalculated the interest" "please explain" but:

> Otherwise, my view is there should no
> longer be a dispute between the parties as
> to any tax amount the City claims is owed by
> Travelocity for the period after August 13,
> 2007.  I understand the Court will need to
> resolve the parties' disagreement as to
> whether the 100% penalty is applicable to
> the time period prior to the enactment of
> the 100% penalty in June/July 2010 . . . We
> are not asking the City to release or
> otherwise waive these claims.

<u>Id.</u> at 2.

After a month passed without a response from the City, Travelocity followed up with another letter dated February 18, 2011 (the "February 18 Letter"), asking if the City intended to identify any additional amounts it believed owed by Travelocity or respond at all to the January 11 Letter. [Document 192-2] Ex. 8. On October 30, 2012, Travelocity sent the City an email stating that it had miscalculated the amount of the check by using hotels outside the City and when applying the same calculations as were performed in the December 17 Letter, the "total amount is $101,223.98." [Document 192-2] Ex. 11.

The City never cashed or returned the check to Travelocity. To date, the check remains in the City's possession.

The Court concludes that a reasonable fact finder necessarily would conclude that, no later than January 11, 2011,[4] the City knew – or certainly should have known – that it had a Travelocity check in the amount of $114,241.56 tendered as a payment to be applied to Travelocity's Occupancy Tax liability for the period at issue. Whether the amount is ultimately determined to be an underpayment or an overpayment makes no difference. That payment was unconditional and is deemed to have been made on January 11, 2011.

---

[4]    The Court ignores, as <u>de minimis</u>, the difference between the January 11, 2011 date affixed to Travelocity's Letter and the date when the City actually received the Letter.

The City has presented no valid reason why it was not able to, and why it did not, accept the check as a payment on account. The City has presented no valid reason to support the conclusion that it was free to refuse to cash the check and cause Travelocity to suffer ongoing accrual of interest and penalties on the Occupancy Tax reflected in the tendered check.

The Court finds specious the City's tardily presented contention that it could not have legally accepted a payment on Travelocity's tax liability unless Travelocity filed a tax return with the payment. Indeed, in correspondence with Travelocity regarding payment of Occupancy Tax due and owing, the City made no mention of the necessity of a tax return in order for any payment by Travelocity to be accepted by the City. Nor is there validity to the argument that the City was not able to accept a payment from Travelocity toward its tax liability in an amount less than the total amount the City contends was/is due. To the contrary, the City's "Policies and Procedures for Monthly Hotel Tax Returns" provide for acceptance of less than full payment of an amount found due on a tax return and the issuance of a delinquency notice for the balance due. [Document 192-3] Ex. 14.

Accordingly, the City is deemed to have received a payment of $114,241.56 on January 11, 2011, to be applied as paid on that date to whatever liability Travelocity may have for the

taxes, penalties, and interest ultimately determined for the
period at issue.[5]


     C.   <u>Interest Accrual</u>

    From the summary judgment briefing and the hearing, it
appears that the parties are in agreement that under all
versions of the 2007 Ordinance interest is calculated against
outstanding Occupancy Tax liability. Thus, there is no issue
for the Court to resolve.


     D.   <u>Penalty Base</u>

    Travelocity maintains that penalties are applied against
only the tax underpayment. The City takes the position that
penalties are calculated on the total of the tax underpayment
and the interest due on that underpayment.

    Under Maryland law, "[t]he cardinal rule of statutory
interpretation is to ascertain and effectuate the intention of
the legislature."[6] <u>Oaks v. Connors</u>, 660 A.2d 423, 429 (Md.

---

[5]    The City may, indeed should, now deposit the check at
issue. If the check has become nonnegotiable due to the City's
delay, Travelocity shall provide a currently dated replacement
check in the same amount. To the extent the $114,241.56 turns
out to be an overpayment upon final calculation, the City, of
course, shall refund such amounts to Travelocity in due course.
Consistent with the Court's decision, any replacement check,
although currently dated, will be deemed to constitute a payment
made on January 11, 2011, for computational purposes.
[6]    Under Maryland law, ordinances are interpreted under the
same canons of construction that apply to statutes. <u>Mueller v.</u>

1995).  To determine legislative intent, a court first looks to the plain language of the statute.  See Williams v. Mayor & City Council of Baltimore, 753 A.2d 41, 48-49 (Md. 2000); Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin., 697 A.2d 455, 458-59 (Md. 1997).  If the language of the ordinance is "free from ambiguity," a court will give effect to the ordinance according to its plain meaning.  Williams, 753 A.2d at 48-49 (citing Marriott Emps., 697 A.2d at 448).

As relevant hereto, the City amended the civil interest and penalties section of the Ordinance in 2010 and 2012.  The 2010 version provides for "a penalty of 100% of the tax due" while the 2012 version provides for a penalty on the "amount due." Because the Court has determined that Travelocity is deemed to have made a payment against its liability in the amount of $114,241.56 on January 11, 2011, the 2012 version is inapplicable to that payment and the Court need not address the City's contentions related to the proper penalty base under the 2012 version.  Based on the City's representations at the hearing, the City is not asserting the "interest and tax" argument with respect to the 2010 version of the Ordinance.  In any event, even if the City were taking that position, it would be rejected.

---

People's Counsel for Baltimore Cnty., 934 A.2d 974, 999 n.17 (Md. Ct. Spec. App. 2007).

The 2010 version implements a penalty against a deficient taxpayer of "100% of the amount of the tax due." By the plain language of the Ordinance, the penalty is assessed against the "tax" and not the "tax and interest" or some other base amount greater than the outstanding tax itself. Furthermore, the City has interpreted the 2010 version to assess penalties only against the tax due. For instance, in the July 15 Letter – dated after the effective date of the 2010 version – the City calculated penalties against only the Occupancy Tax alleged to be due from Travelocity.

Therefore, Travelocity is entitled to summary judgment that under the 2010 version, penalties are calculated on outstanding taxes alone.

E.    Penalty Rate

There is no dispute that Travelocity is liable for Occupancy Tax for the entire period at issue, i.e., from the August 14, 2007 effective date of the 2007 Ordinance through November 30, 2010 (the day before Travelocity began paying the tax on a current basis).[7]  As discussed above, the Court holds that Travelocity effectively paid $114,241.56 for application to[8]

---

[7]    The Court appreciates the City's position that Travelocity to this date has not been paying its entire Occupancy Tax obligations as a result of breakage transactions.  The Court considers this a separate issue.

[8]    Whether this constitutes an overpayment or underpayment of

its liabilities for the period at issue on January 11, 2011.

As relevant hereto, from August 14, 2007 to June 30, 2010, the Ordinance imposed a penalty of 10% of the amount of taxes found to be due by any person that failed to pay the Occupancy Tax. [Document 192-1] Ex. 1.  Effective July 1, 2010, the City increased the penalty to 100% of the "tax due."  [Document 192-1] Ex. 2.  Pursuant to the Ordinance, Occupancy Tax must be remitted to the City's Director of Finance "on or before the 25th of each month" covering the preceding calendar month.  Art. 28 § 21-4(a)(2).  That is taxes due, collected, or remitted for the month of July must be remitted to the City by August 25. [Document 192-4] Ex. 19, at 2.

The parties debate whether, with regard to a payment of past due Occupancy Tax remitted after June 30, 2010, the penalty rate is 10% or 100%.  Travelocity takes the position that the pertinent rate is the rate in effect on the date the tax originally became overdue.  If Travelocity's position is accepted, the applicable rate would be 10% for tax due for the months through June 2010 and 100% for tax due for the months at issue thereafter (July through November 2010).  The City takes the position that, by virtue of the post-June 2010 payment date, the penalty rate for all months at issue is 100%.

---

Travelocity's ultimately determined liability for tax, penalty, and interest necessarily depends upon the resolution of all issues.

1.  Retroactivity

Travelocity asserts that application of the 100% penalty to
Occupancy Tax that first became due to the City or accrued
before July 1, 2010, would be a retroactive application of the
penalty provision. The City asserts that the 2010 version of the
Ordinance does not operate retroactively because the penalty is
applied and assessed at the time payment is made for delinquent
taxes.

The Maryland Court of Appeals has referred to a retroactive
statute as one "'which purports to determine the legal
significance of acts or events that have occurred prior to the
statute's effective date'" and/or a statute that affects
"dealings, contracts, or statutes that existed prior to the
effective date of the statute." State Ethics Comm'n v. Evans,
855 A.2d 364, 374 (Md. 2004) (quoting State Comm'n on Human
Relations v. Amecom Div. of Litton Sys., Inc., 360 A.2d 1, 3
(Md. 1976)).[9] However, adopting the analysis of the Supreme

---

[9]    In Evans, the defendant was a registered lobbyist who had
been convicted of wire and mail fraud as a result of his
lobbying activities.  Two years after he completed his criminal
sentence, the Maryland General Assembly enacted § 15-405 into
law, which for the first time allowed the Ethics Commission to
revoke or suspend a lobbying registration if a lobbyist had been
convicted of a criminal offense arising from lobbying
activities.  Ethics Comm'n v. Evans, 855 A.2d 364, 367-68 (Md.
2004).  The Maryland Court of Appeals considered retroactive the
application of § 15-405 to revoke Evans' lobbying registration
based upon his conviction, which occurred prior to the statute's

Court in <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244 (1994), the Maryland Court of Appeals has explained that there is no "bright line rule . . . a statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment." <u>John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.</u>, 957 A.2d 595, 600 (Md. 2008). In deciding whether a law has retroactive application, a court is to assess "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event" by considering factors like "fair notice, reasonable reliance, and settled expectations." <u>Id.</u> (internal quotations and citations omitted) (applying <u>Landgraf</u> factors and holding on certified question that application of statutory good cause termination provision to dealer agreement executed before enactment of statute was not a retroactive application where dealer agreement was "a succession of renewable contracts lasting 120 days" and the contract had renewed within 120 days of enactment); <u>Muskin v. State Dep't of Assessments & Taxation</u>, 30 A.3d 962, 970 (Md. 2011) (applying <u>Landgraf</u> model and holding that although registration aspect of statute regulates future action of ground rent owners, it operates retrospectively because upon a failure to register timely "the SDAT is required to reach back in time and divest

effective date. <u>Id.</u> at 382.

13

the reversionary interest of the ground rent owner and cancel
his/her/its right to receive future ground rent from the
leaseholder").

Here, the 2007 and 2010 versions of the Ordinance impose a
penalty on the tax due on any person that fails "to make a
proper return when due, or to pay the taxes collected . . . over
to the Director of Finance when due." [Document 192-1], Ex. 2,
1. Occupancy Taxes are "due" to the City on the 25th of the
month following the month in which the Occupancy Tax is
collected (or the payment subject to the tax is remitted).
Pursuant to the plain language of the 2007 and 2010 versions of
the civil interest and penalties section of the Ordinance, a
penalty accrues to any owed Occupancy Tax at the instant the tax
first becomes overdue. For example, if Travelocity collects
$100 in Occupancy Tax in August 2009 and fails to remit those
tax monies by September 25, 2009, Travelocity becomes liable for
a 10% penalty on that Occupancy Tax as of September 26, 2009.
Stated differently, the qualifying event that triggers the
penalty is the conversion of the Occupancy Tax liability from
due to past due. Even if the penalty is assessed by the City at
the time of a past due Occupancy Tax payment, the penalty
liability commenced at the moment that tax first became past
due.

In July 2010 the City increased the penalty from 10% to

14

100%, that is by 900%.  The City's application of the 100%
penalty to acts subject to penalization (i.e., failure to pay
Occupancy Tax on the date due) that occurred prior to the
effective date of the 2010 version changes the legal
significance of those acts.  See generally Karpa v. C.I.R., 909
F.2d 784, 786-88 (4th Cir. 1990) (concluding that amendment that
increased penalty for "substantial understatement of income tax"
from 10% to 25% and applied only to penalties assessed after its
effective date was a retroactive application of a civil tax
penalty, and thus did not offend the ex post facto clause, where
the amendment applied to tax returns filed before the effective
date of the amendment).  For instance, Occupancy Tax that first
became overdue as of June 26, 2010, and subject to a 10% penalty
as of that same date, would incur a 100% penalty as of July 1,
2010, so long as the tax had remained unpaid.

In light of the factors referenced in John Deere, fair
notice appears to be lacking.  The Council Bill indicates it was
signed by the Mayor on June 21, 2010, and that the Bill was to
take effect July 1, 2010.  [Document 192-1] Ex. 2.  At best,
taxpayers had nine days' notice that Occupancy Tax outstanding
prior to June 14 would be subject to a 900% penalty increase
beginning July 1, 2010.  Also, taxpayers would have had, at
best, four days' notice that a failure to pay timely Occupancy
Tax due on June 25, 2010, would result in a 900% increase of the

penalty if the late payment was not made by June 30, 2010.  As

to reasonable reliance, it would certainly be reasonable to rely

on the existence of a 10% penalty insofar as the penalty

automatically attaches on the date Occupancy Tax originally

becomes overdue.  With respect to settled expectations, at least

from 1966 to 2010, the Ordinance imposed a 10% penalty.  See

[Document 117-5] (sealed) Ex. 2-3.

The City takes the position that application of the 100%

penalty to Travelocity's tax liability that first accrued prior

to July 2010 is prospective because the 100% penalty is assessed

and applied to future payments of outstanding Occupancy Taxes.

According to the City, Travelocity is "being penalized today for

their tardiness in payment which has continued to this very

day." [Document 197] (sealed) at 8.  While the actual dollar

total of penalties owed by a taxpayer may be configured by the

City at the time a late tax payment is made, the penalty itself

attaches and becomes an unconditional liability[10] of the taxpayer

the moment the Occupancy Tax payment crosses the temporal line

from timely to untimely.  Furthermore, even if the 2010 version

of the Ordinance can be said to have prospective application in

one sense, it may still be held to operate retroactively in

another sense.  See Muskin, 30 A.3d at 970.

---

[10]    Absent an act of the Director of Finance "to compromise
disputed claims in connection with the tax imposed."  Art. 28 §
21-8.

Accordingly, the Court concludes that the application of the 2010 civil interest and penalties version of the Ordinance to outstanding Occupancy Tax that accrued or first became overdue prior to July 1, 2010, the effective date of that version, would constitute a retroactive application of the 100% penalty provision.

### 2.  Permissibility of Retroactive Effect

Like other laws, tax laws can, in some circumstances, permissibly have retroactive effect.  However, Travelocity contends that the penalty increase at issue does not satisfy the test for retroactivity under Maryland law.  The City asserts it does.

Under well-established principles of Maryland law, statutes are free to be given retroactive effect so long as certain requirements are satisfied.  First, there is a presumption that statutes apply prospectively: an "amendatory act takes effect, like any other legislative enactment, only from the time of its passage, and has no application to prior transactions, unless an intent to the contrary is expressed in the act or clearly implied from its provisions."  See, e.g., State Tax Comm'n v. Potomac Elec. Power Co., 32 A.2d 382, 384 (Md. 1943).  However, even if a legislative intent to apply a statute retroactively is adequately established, "a statute will not be permitted to so

apply if such an application would impair a vested right", deny due process, or violate the prohibition against ex post facto laws. Evans, 885 A.2d at 370, 387.

In applying the presumption against retroactivity, the Maryland Court of Appeals has explained that "a statute will be found to operate retroactively only when the Legislature 'clearly expresses an intent that the statute apply retroactively.'" Allstate Ins. Co. v. Kim, 829 A.2d 611, 618 (Md. 2003) (quoting Waters Landing Ltd. P'ship v. Montgomery Cnty., 650 A.2d 712, 718 (Md. 1994)). In determining legislative intent:

> . . . [W]e begin with the plain meaning of the statutory language. If the intent is clear from that language, there is no need to search further. If the intent for which we search cannot be gleaned from the statutory language alone, we may, and often must, look for evidence of intent from legislative history or other sources

Id. at 619 (holding language in statute abolishing parent-child immunity in vehicle-tort action, which stated abolishment was applicable to "any case . . . filed on or after" a certain date, evidenced legislative intent to apply the law retroactively to causes of action arising before that date but filed after it).

The plain language of the 2010 version instructs that if any taxpayer "refuses" or "fails" to pay the Occupancy Tax when due, the taxpayer "is liable for and must pay to the Director,

in addition to the tax due" a "penalty of 100% of the amount of

the tax due." [Document 192-1] Ex. 2.  With respect to

collection, the 2010 version explains that the penalty "shall be

collected as part of the tax itself." Id.  It may be that there

are no "magic words" essential to evidence a retroactive

legislative intent, but the language in the 2010 Ordinance does

not contain the faintest hint of a legislative intent to have

the new 100% penalty rate apply to Occupancy Tax liabilities

that first accrued prior to the effective date.  Nor is

retroactivity in this context a "necessary inference form the

statutory language itself." See Kim, 829 A.2d at 619-20.

Imposition of the 10% penalty to taxes that came due prior to

the effective date of the 100% penalty would not be at odds with

anything within the 2010 version of the civil interest and

penalties section. The Court notes that the qualifying offending

conduct (refusal or failure to pay) is drafted in the present

tense, which if anything indicates a legislative intent for the

100% penalty provision to apply prospectively to Occupancy Tax

not yet overdue.  Lastly, the City points to nothing in the

legislative history or other aspects of the Ordinance supportive

of a retroactive legislative intent.[11]

---

[11]    The only evidence of a retroactive intent is the City's
application of the 100% penalty.  However, it does not appear
that the City's retroactive application of a statute or
ordinance – by itself - is sufficient to establish a clear
legislative intent necessary to overcome the presumption of

The Court finds it significant that when the City amended the interest and civil penalty section of the Ordinance in 2012, it provided that the "penalty imposed by [this subsection] applies to all unpaid taxes regardless of the original date on which the unpaid taxes first became due." [Document 192-1] Ex. 3. This amendment strongly supports the conclusion that the 2010 penalty increase did not have the retroactive effect provided by the 2012 amendment.

The Court finds no clear expression of any intent by the City legislature to subject Occupancy Tax that first became due prior to the effective date of the 2010 version of the Ordinance to a 100% penalty capable of overcoming the presumption against retroactivity.[12] Without such an expression of intent, Maryland law precludes retroactive application of the 2010 penalty version in this case.

Accordingly, the Court finds that Travelocity is entitled to summary judgment establishing that the 2010 version of the civil interest and penalties section of the Ordinance does not apply retroactively to Occupancy Tax that originally became due prior to the effective date of that section, July 1, 2010.

_____

prospective operation.
[12] Under Maryland law, a statute will be given retroactive effect even in absence of a clear legislative intent if "the statute affects only procedures or remedies." State Comm'n on Human Relations v. Amecom Div. of Litton Sys., Inc., 360 A.2d 1, 4 (Md. 1976). The City does not take the position that the 2010 version Section affects only procedures or remedies.

F.    Breakage Transactions

1.    Definition and Presence in This Litigation

It is agreed that the following, using hypothetical amounts, presents a representative scenario of an OTC transaction for purposes of the instant case:

1.    A hotel in the City agrees that an OTC can allow a customer to use a hotel room in return for the OTC's paying the hotel a specified amount, assumed for hypothetical purposes to be $100.

2.    A customer gets on the OTC website and pays the OTC a hypothetical total of $220 for the use of the room.  The statement provided to the customer indicates that there was a payment for $200 for the room and $20 for "taxes and fees."

3.    The OTC – either before or after actual room occupancy – pays the hotel $108, of which $8[13] is treated as Occupancy Tax and remitted to the City by the hotel.

4.    The OTC retains the remaining $112 and historically did not pay any Occupancy Tax on the $112.

Therefore, in the hypothetical representative transaction, Travelocity (1) receives $220 from the customer and (2) pays the hotel a total of $108, consisting of $100 for the hotel room and $8 for Occupancy Tax that the hotel pays over to the City.

---

[13]    Assuming an 8% Occupancy Tax rate.

Thus, after payment to the hotel in in this transaction,

Travelocity would retain $112.  Based on the Court's decisions

in the instant case, the $112 retained by Travelocity is subject

to the City's Occupancy Tax.  In light of that determination,

the parties have agreed that for purposes of calculating tax

deficiencies, the Occupancy Tax "is computed upon the total

amount paid to the OTC reduced by the amount of Occupancy Tax

that had already been [paid] in regard to the room rental."

Mem. & Order Re: Remaining Summ. J. Issues [Document 181] at 5.

In terms of the hypothetical representative transaction:

> 1.   The tax base is $212, consisting of the
>      $220 total paid Travelocity minus the
>      $8 that was passed through to the hotel
>      to pay to the City as Occupancy Tax.
>
> 2.   The total tax on the transaction is
>      $16.96 (8% of the $212).
>
> 3.   The amount of tax due to the City from
>      Travelocity (net tax deficiency) is
>      $8.96 ($16.96 minus $8, to avoid double
>      taxation).

Thus, in a normal transaction, the $220 paid by the

customer to Travelocity is ultimately received as follows:

| | |
|---|---|
| Travelocity | $112 |
| Hotel | $100 |
| City | $8 |
| Total | $220 |

The net deficiency due from Travelocity is $8.96 (i.e., $16.96 total tax less $8.00 paid through the hotel to the City).

A breakage transaction is one in which the hotel does not receive the payment it is due from Travelocity, often because the hotel failed to invoice Travelocity.  In that situation, using amounts from the hypothetical representative transaction, Travelocity retains the entire $220 it received from the customer. Thus, in a breakage transaction the $220 paid by the customer to Travelocity is ultimately received as follows:

| | |
|---|---|
| Travelocity | $220 |
| Hotel | $0 |
| City | $0 |
| Total | $220 |

The net deficiency due from Travelocity in a breakage transaction will be the total tax on the transaction with a credit for any amount of tax that the hotel (or potentially Travelocity) paid in regard to the transaction.

Breakage transactions are within the type of transactions placed in issue by the City in the instant case.  The label "breakage" may not have been used initially, but the essence of the City's claim has been that the OTC's received payment for room rental and were required to pay Occupancy Tax on those

payments.  Accordingly, the City has asserted a claim for Occupancy Tax on breakage transactions.

###     2.    Taxable Event

According to the City, breakage generally occurs because either (1) the OTC customer shows up and stays at the hotel, but the hotel fails to invoice Travelocity so that Travelocity never makes a payment to the hotel for the transaction (the "invoice failure situation") or (2) the OTC customer[14] never shows up to the hotel to use the room booked through the OTC transaction and as a result Travelocity never makes a payment to the hotel (the "no show situation").[15]

Travelocity concedes that the invoice failure situation gives rise to a taxable event under the 2007 Ordinance. However, Travelocity argues that the no show situation does not include a taxable event because the customer does not use the room.  The Court rejected this argument when it held the 2007 Ordinance applicable to an OTC transaction.  In the Memorandum and Order Re: Motions for Summary Judgment, the Court concluded:

> . . . The   undisputed   facts,   however,

---

[14]    It could be that the OTC customer is not the actual guest who ultimately uses the hotel room, but for simplicity the Court will assume the OTC customer and the ultimate guest at the hotel are the same person.

[15]    In the "no show" situation, the City does not include within its definition of a breakage transaction a scenario in which Travelocity refunds to the OTC customer the monies collected or the hypothetical $220.

> establish that OTCs do, in fact, receive
> payment from customers "for the [customer's]
> rental of a hotel room for sleeping
> accommodations." In terms of the agreed
> facts and hypothetical illustration, the OTC
> receives $200 from the customer designated
> as consideration for the customer's use of
> the hotel room for sleeping accommodations.

[Document 167] at 15. In the summary judgment decision, the
Court rejected Travelocity's assertion that because it arranges
for the booking of hotel rooms it is not subject to the
Occupancy Tax, reasoning that "[a]ny rational reading of the
Ordinance categorizes what the OTC does for the customer, even
if described by the word 'booking,' as arranging the rental of a
hotel room within the meaning" of the 2007 Ordinance. Id. at
16.

The nature of the OTC transaction or the payment made by
the OTC customer to Travelocity does not change as the result of
the fact that the OTC customer is subsequently a no show at the
hotel. That is, at the time of the OTC payment to Travelocity
the traveler/OTC customer is still paying Travelocity for
"renting, using, or occupying" a hotel room even though it turns
out that the traveler/OTC customer fails actually to use the
hotel room he or she had rented.

Nor does the Court find persuasive Travelocity's reliance
on City of Houston v. Hotels.com, L.P., 357 S.W.3d 706 (Tex.
App. 2011). In City of Houston, the Court of Appeals of Texas

25

addressed an ordinance imposing occupancy tax on the "cost of occupancy." Upon evaluation of the language in that ordinance, the court found reasonable the interpretation that the tax applied only to the discounted rate paid by the OTC to the hotel. Based on that holding, the Texas appellate court concluded that the ordinance at issue did not apply to breakage transactions since by definition "the hotel ultimately was paid no consideration for the right to use or possess the room." 357 S.W.3d at 715 & n.8. Here, the Court has already determined that the Occupancy Tax imposed by the City's 2007 Ordinance taxes more than just the discounted or net rate paid by Travelocity to a hotel. Further, as recognized by the Texas appellate court in the City of Houston case, analysis in this context is difficult to analogize to other cases addressing hotel tax ordinances with different wording. See id. at 707 (explaining that there are occupancy suits all over the country but "the outcome of each case depends on the evidence introduced and the language of the taxing provision at issue").

Travelocity asserts that consideration of the no show situation as a taxable event is inconsistent with the City's stated position that cancellation fees are not taxable under the Ordinance. In its Policies discussed supra, the City instructs that "gross revenue" (i.e., revenue subject to Occupancy Tax) "shall **NOT** include penalty fees collected from transient

occupants not checking-in, early/late departure fees, rebates,
overcharges, group cancellation fees, service fees, energy
surcharges, and components of a package rate other than the room
itself." [Document 192-3] Ex. 14, at 14 (emphasis in original).
Travelocity has submitted nothing supporting its contention that
in the event a traveler/OTC customer is a no show at the hotel,
Travelocity retains the entire payment from the OTC transaction
as a "cancellation fee."


        3.    <u>Taxable Base</u>

    Travelocity asserts that in a breakage transaction, using
the hypothetical scenario, the taxable base is $212 as in a
normal transaction, and that any taxes owed on such transactions
should be discounted or credited in the event the hotel remitted
the Occupancy Tax.  The City argues that in a breakage
transaction the taxable base, in terms of the hypothetical
scenario, is $220 because there is no $8 paid over to the hotel
as Occupancy Tax.

    The 2007 Ordinance imposes a tax on "all gross amounts of
money paid to the owners or operators of hotels in the City . .
. for renting, using, or occupying a room or rooms in those
hotels for sleeping accommodations."  Art. 28, § 21-2.  The
Ordinance defines "gross amounts of money" as "the total gross
payments of any kind or character . . . without any deduction

for charges or other amounts for any services necessary to complete the transaction." Id. § 21-1(b).

The parties reached an agreement as to the taxable base in a non-breakage transaction. Specifically, the parties agreed that the "total tax due is computed upon the total amount paid to the OTC reduced by the amount of Occupancy Tax that had already been [paid] in regard to the room rental." [Document 181]. In other words, it was agreed, in that context, that the $8 earmarked for payment to the hotel for remission to the City was not within the taxable base since that amount was not paid for room rental. This agreement is equally applicable to breakage transactions. The post-payment failure of a customer to show up at the hotel or of a hotel to bill Travelocity does not retroactively change the character of the $8 initially paid in the OTC transaction by rendering it a payment for room rental as distinct from tax. The Court finds that it must conclude that the $8 cannot be considered part of the taxable base in a breakage transaction any more than in a normal transaction. As a result, the $8 is properly excluded from the taxable base in a breakage transaction.

Accordingly, Travelocity is liable for Occupancy Tax with regard to breakage transactions, but the taxable base for such a transaction is determined in the same fashion as for a normal transaction.

II.  <u>SANCTIONS</u>

Travelocity asserts that the City has failed without justification to satisfy its discovery obligations under Rule 26(a)(1)(A)(iii) and (e)(1) to disclose and supplement its damage computations and should thus be precluded from disputing Travelocity's calculation of the total amount owing for August 14, 2007 to November 30, 2010 ($101,223.98)[16] as well as precluded from seeking damages for breakage transactions.  The City maintains that it has complied with all of its discovery obligations.

A.  <u>Pertinent Discovery Principles</u>

As part of a party's initial disclosures, Rule 26(a)(1)(A)(iii) requires disclosure of a "computation of each category of damages claimed by the disclosing party."  Generally speaking, a disclosure under this rule must state the "types of damages that the party seeks, must contain a specific computation of each category, and must include documents to support the computations."  <u>Silicon Knights, Inc. v. Epic Games, Inc.</u>, 5:07-CV-275-D, 2012 WL 1596722, at *1 (E.D.N.C. May 7, 2012) (discussing such obligations in context of lawsuit for fraud, breach of contract, and other torts in connection with a

---

[16]    This amount is based upon the "tendered check" issue discussed <u>supra</u>.

non-exclusive license for software).  Rule 26(e)(1) imposes an
obligation to supplement a party's damage disclosures "in a
timely manner if the party learns that in some material respect
the disclosure or response is incomplete . . . and if the
additional . . . information has not otherwise been made known
to the other parties during the discovery process or in
writing."

Rule 37(c)(1) provides a district court with discretion to
preclude a party from introducing evidence to establish damages
when the party fails to make a Rule 26(a)(1)(A)(iii) disclosure
or fails to supplement such a disclosure under Rule 26(e),
"unless the failure was substantially justified or is harmless."
However, instead of or in addition to the preclusion sanction,
the court "may impose other appropriate sanctions."  Fed. R.
Civ. P. 37(c).  In the Fourth Circuit, five factors are utilized
to determine whether a disclosure failure was substantially
justified or harmless:

> (1) the surprise to the party against whom
>     the evidence would be offered;
>
> (2) the ability of that party to cure the
>     surprise;
>
> (3) the extent to which allowing the
>     evidence would disrupt the trial;
>
> (4) the importance of the evidence; and
>
> (5) the nondisclosing party's explanation
>     for its failure to disclose the evidence.

<u>S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.</u>, 318
F.3d 592, 597 (4th Cir. 2003).  "Determining the existence of [a
discovery obligation] and imposing sanctions for its breach are
matters properly committed to the sound discretion of the trial
judge."  <u>See</u> <u>Phil Crowley Steel Corp. v. Macomber, Inc.</u>, 601
F.2d 342, 344 (8th Cir. 1979).


    B.   <u>The City's Disclosures</u>

In the Complaint, the City seeks damages for the
Defendants' failure to remit Occupancy Tax on OTC transactions
as required by the Ordinance in the amount of all tax monies
"that should have been paid to date based upon the retail rates
Defendants charged consumers for the rental of hotel rooms in
Baltimore City" as well as penalties and interest on the unpaid
taxes "[u]nder Baltimore City Code Article 28, § 21-5."  Compl.
[Document 1] ¶¶ 64, 80-81.

On July 23, 2009, in its Rule 26(a) disclosures, the City
stated that as to a damage computation "[d]iscovery has not yet
commenced and Plaintiff does not yet have access to the
information and documents kept by Defendants and necessary to
perform a damages computation."  [Document 200-4] Ex. A-16, at
2.  The City also provided the following list of documents in
its possession, custody or control that the City "may use to
support its claims": "Baltimore City Code art. 28, § 21-1, <u>et</u>

seq."; "Letters to Defendants from the Baltimore City Department of Finance to collect taxes and Defendants' responses"; "Baltimore City Bureau of Treasury Management, Collection Division – Hotel Room Tax Rules and Regulations (July 20, 1990)"; and "Hotel Tax Registration forms."[17] Id. at 6. Pursuant to the Second Scheduling Order [Document 106], fact discovery closed on January 21, 2011, and expert discovery ended approximately in mid-April 2011. On August 2, 2011, the Court issued the summary judgment decision establishing the Defendants' liability for the Occupancy Tax under the 2007 Ordinance, and on July 23, 2012, denied Travelocity summary judgment on its affirmative defenses. After a status conference with the Court and in connection with the issuance of the Procedural Order [Document 191], the City submitted a status report presenting its position on the remaining issues identified by the parties related to the calculation of interest and penalties on unpaid taxes and breakage transactions.

C. Adequacy of the City's Disclosures

Travelocity's motion for sanctions can be boiled down to the following three complaints: (1) even though damages will be computed pursuant to the Ordinance, the City failed timely to

---

[17] The City provided this list of documents for its Rule 26(a)(1)(A)(ii) disclosures and not its Rule 26(a)(1)(A)(iii) disclosures.

disclose the precise method by which it would be calculating damages (_i.e._, interest and penalties on unpaid taxes) in this case (the "methodology complaint"); (2) the City failed timely to identify explicitly and define breakage as a category of damages sought (the "breakage complaint"); and (3) the City has failed to provide a calculation of the dollar amount of damages it claims due (the "calculation complaint"). The Court shall address each asserted shortcoming in turn.

### 1.   The Methodology Complaint

As relevant hereto, in 2007, 2010, and 2012 the City amended the "interest and civil penalties" section, § 21-5, of the Ordinance, which provides for the manner in which interest and penalties are to be computed for Occupancy Tax underpayments and non-payments. For example, as of August 14, 2007, § 21-5 stated:

> Any person . . . failing to collect the taxes imposed by this subtitle, or to make a proper return when due, or to pay the taxes collected . . . shall be liable for:
>
> (1) interest on the amount of tax due at the rate of 1% per month or any faction thereof; and
>
> (2) a penalty of 10% of the amount of taxes found to be due by him or it.

[Document 192-1] Ex. 1. The succeeding amendments changed certain of the wording and penalty computation/amount, but did

33

not add any appreciable detail to § 21-5.

As alleged in the Complaint, the City's damage claim has three components: Occupancy Tax underpayments/non-payments, interest, and penalties.[18]  While the parties have presented legal arguments as to which version(s) of § 21-5 is controlling and how that version(s) should be applied to Travelocity's tax deficiencies, there can be no reasonable dispute that the statutory source of the City's damage claim has been apparent since the filing of the Complaint.

Neither the Complaint nor the City's initial disclosures divulged anything as to interest and penalty calculation methodology outside referencing § 21-5 of the Ordinance.[19] However, in a letter dated July 15, 2010[20], sent by the City to "Travelocity.com LP and Travelocity.com Inc."[21], the City informed Travelocity that it had amended the Ordinance in June 2010 (attaching a version of the new Ordinance) and demanded payment for, inter alia, August 13, 2007 to April 30, 2009 Occupancy Tax ($58,952.26), interest ($6,160.50), and penalties

---

[18]    In the Complaint, the City seeks reasonable attorneys' fees.  Because that issue has not been identified by any party, the Court will not now address it.
[19]    The City's initial disclosures are dated July 23, 2009, a little less than a year before the City amended § 21-5 to increase the penalty from 10% to 100%.  Hence, any position that the 100% penalty would be applied to all outstanding taxes regardless of the date upon which such taxes originally became due would have had to have been disclosed to Travelocity as a supplement.
[20]    Prior to the close of fact discovery.
[21]    The body of the letter referenced "Site59.com LLC."

($58,952.26).  [Document 192-4] Ex. 15.  In the July 15 Letter,
the City calculated penalties for both pre-2007 and post-2007
tax liabilities pursuant to the June 2010 amended version of the
Ordinance, which increased statutory penalties from 10% to 100%.
The letter also warned that further interest and penalties would
accrue absent payment by July 25, 2010.  Subsequently, in
response to a letter from Travelocity tendering a check for
outstanding tax liability, counsel for the City in the January 5
Letter stated that Travelocity had miscalculated the penalty
amount because "Baltimore's penalty provision applies at the
time of payment, rather than the time of booking.  The actual
penalty provision in effect is one hundred percent."  [Document
192-1] Ex. 6, at 1.  After the close of fact discovery, the City
again amended the interest and penalty provision of the
Ordinance in January 2012, but did not send a similar demand
letter to Travelocity or formally supplement its initial
disclosures with such information.

The Court finds that the City satisfied its discovery
obligations with respect to the methodology complaint and, even
if it was not perfect, its imperfections were harmless.  In a
suit where the City's claim for interest and penalties on
Occupancy Tax deficiencies emanate from a single statutory
provision, it is unclear whether Rule 26(a)(1)(A)(iii) required
the City to disclose a precise methodology or formula for

calculating such things in addition to referring Travelocity to the statutory language. In any event, the City otherwise made known to Travelocity in writing its methodology for interest and penalty calculation under the 2010 version of the Ordinance in the July 15 Letter thereby obviating the need to supplement formally its initial disclosures. See Fed. R. Civ. P. 26(e). In that letter, the City revealed its methodology of assessing penalties based upon the version of § 21-5 in effect at the time payment is made on the tax deficiency. The City reiterated this position in its January 5 Letter. However, when the City amended the Ordinance in 2012 (effective January 4, 2012), it did not disclose to Travelocity its interest and penalty methodology contentions until December 14, 2012, the date the City filed its status report with the Court.

Even if the City failed timely to disclose the precise methodology of its interest/penalty calculation in violation of Rule 26(a)(1)(A)(iii) and (e)(1), such a failure was harmless. The City's method for calculating penalties based on the version of § 21-5 in effect when Travelocity makes a payment for tax liability could not have come as a surprise to Travelocity in light of the July 15 and January 5 Letters. Nor would it be surprising that the City maintained this view under the 2012 Ordinance because that version of § 21-5 added language that the penalty imposed "applies to all unpaid taxes regardless of the

original date on which the unpaid taxes first became due."
[Document 192-1] Ex. 3.

To the extent Travelocity did experience any surprise as to the City's asserted methodology for calculating interest and penalties under § 21-5, the surprise has been cured by subsequent court filings. Prior to filing the instant summary judgment motion, Travelocity had the benefit of the City's December 14 Initial Statement of Positions [Document 190] and subsequent Reply [Document 197], which detailed the City's stance on interest and penalty computation. Lastly, permitting the City to offer evidence in support of its methodology positions[22] would not disrupt any future proceedings. Thus, Travelocity is not entitled to sanctions on the basis of its methodology complaint.

2.    Breakage Complaint

Throughout this entire litigation, the City has taken the position that all OTC transactions are subject to the Occupancy Tax. It is true that in its initial disclosures and/or supplements thereto, the City did not use the label "breakage transactions" to refer to a category or subcategory of damages and/or offer a formula as to how damages in breakage

_____

[22]    Since the interest/penalty issues are largely questions of statutory interpretation, it is unclear what "evidence" has surprised Travelocity or disrupted proceedings.

transactions are to be calculated. Yet, the issue of taxing

what are now labeled as breakage transactions has not been

wholly absent from discovery in the instant litigation. On

December 15, 2010, in a deposition of a Travelocity witness in

this case, the witness answered questions related to tracking

"breakage" and said Travelocity cannot track breakage by

location. [Document 200] Ex. 22, at 133:22-134:4.

Breakage was also the subject of a discovery dispute

between the parties in February and March 2010. The City sought

a Rule 30(b)(6) deposition of a Travelocity witness competent to

testify about the "total revenues (if any) that you have

obtained from 'breakage' from hotel business in Baltimore."

[Document 197-2] (sealed) Ex. 2, at 1-2, 19. Travelocity

responded by stating "the Travelocity Defendants are

investigating whether or not they can identify the total amount

of 'breakage' revenue for merchant model transactions in

Baltimore, and if they can, will designate a witness to testify

on the total amount of 'breakage' revenue." Id. at 19.

In response, the City filed a motion to compel defining

breakage and explaining that:

> . . . [b]reakage is important because the
> amount retained by the Defendants is not
> just a tax on the difference between
> wholesale and retail, but instead the tax on
> the entire retail amount charged. . . . to
> properly compute the full measure of the
> OTCs' liability and Baltimore's damages,
> Baltimore needs to know which transactions

were breakage transactions and which were
not.

Id. In their response, Travelocity did not argue that breakage
was not part of the lawsuit, but insisted that they were "unable
to determine the amount of revenue obtained for so-called
'breakage' transactions specific to Baltimore, which is
consistent with the deposition testimony Travelocity provided in
the Previous Discovery." [Document 197-3] (sealed) Ex. 3, at 3-
4. Lastly, as with the methodology complaint, the City
disclosed its breakage-related positions in the December 14
status letter.

Assuming that the City's failure to identify breakage
specifically in its initial disclosures and/or supplements
thereto as a category of damages constituted a violation of Rule
26(a)(1)(A)(iii) or 26(e), such a failure was harmless. It is
manifest that Travelocity has been on notice of the City's
position with respect to breakage transactions and damages
related thereto as a result of discovery requests and discovery
disputes. Consequently, Travelocity cannot now legitimately
claim it is surprised by the City's breakage related assertions
and any argument by Travelocity that the City had been silent as
to breakage up until December 14, 2012, is disingenuous.
Furthermore, to the extent breakage occurs, records of whether
Travelocity paid a hotel for a particular transaction would

presumably be in the possession and control of Travelocity.[23]  At

the hearing on the instant matter, counsel for Travelocity

represented that he believed Travelocity had the ability to

deduce, using numbers from the hypothetical scenario, whether

Travelocity had paid the $108 to a hotel.  The Court has

directed the parties to submit certain data in hopes of

formulating an estimate of breakage during the time period at

issue.

Accordingly, the Court declines to preclude the City from

offering evidence of breakage-related damages.


### 3.   Calculation Complaint

To date, the City has not provided Travelocity with a

calculation of the exact dollar amount of Occupancy Tax,

interest, and penalties that the City claims is due and owing

from Travelocity.  The City maintains that it does not yet have

access to information and documents necessary to perform a

complete calculation of the total damages because it is unclear

the extent or how long Travelocity has failed to pay all taxes

claimed to be due on breakage transactions.

As discussed herein, the three components of the City's

damages - Occupancy Tax, interest, and penalties – are very

---

[23]    However, Travelocity has represented that it does not and
would not have any record of whether or not a hotel paid the
hypothetical $8 over to the City in a breakage transaction.

familiar to the parties.  The exact calculation of these amounts
depends upon a variety of factors including certain of the
damage-related issues raised by the parties after the Court
resolved the summary judgment motions to establish Travelocity's
liability under the 2007 Ordinance.  Additionally, the figures
provided by Travelocity to the City do not reveal in any
transaction whether Travelocity actually paid the hypothetical
$108 to a hotel.  If breakage occurred and the $108 was never
remitted to the hotel, Travelocity would owe $16.96 in Occupancy
Tax on that transaction as opposed to $8.96, assuming the hotel
or Travelocity did not remit Occupancy Tax on that transaction
to the City.  Without knowing which transactions are breakage,
or an estimate thereof, as well as in which of those breakage
transactions the hotel still made a payment to the City, the
City cannot provide an exact computation of the damages
allegedly owed by Travelocity.

     Since this case concerns unpaid taxes and damages
calculated pursuant to statutory directive, the parties
proceeded first to seek summary judgment on tax liability-
related issues and thereafter to identify damage calculation-
related issues.  Identification of breakage transactions remains
an ongoing effort.  As a result, the Court finds that the City
has not violated Rule 26(a)(1)(A)(iii) or 26(e) on the basis
that it has not, to date, provided Travelocity with an exact

figure of claimed damages.

Accordingly, Travelocity shall not be awarded sanctions.


III. <u>CONCLUSION</u>

For the foregoing reasons,

1. Defendants Travelocity.com LP's and Site 59.com LLC's Motion for Sanctions and Motion for Summary Judgment [Document 200] is GRANTED IN PART AND DENIED IN PART:

2. As discussed herein:

   a. Travelocity is deemed to have paid the sum of $114,241.56 on its liability for Occupancy Tax, penalties, and interest for the period at issue on January 11, 2011.

   b. As agreed by the parties, interest accrues on Occupancy Tax due only and not Occupancy Tax plus penalty.

   c. With respect to the version of the Ordinance that became effective on July 1, 2010, the penalty base is the Occupancy Tax only and not Occupancy Tax plus interest.

   d. With respect to the Occupancy Tax at issue, the penalty rate applied to Occupancy Tax on which a payment was made before the effective date of the 2012 version of the Ordinance, is the rate in effect on the date that the Occupancy Tax first became past due and not a later date on which payment was made.

   e. Breakage transactions are taxable events under the 2007 Ordinance and the taxable base is determined consistently with the determination of the taxable base in normal transactions.

   f. Travelocity is not awarded any sanctions.

SO ORDERED, this Wednesday, August 21, 2013.


_____/s/_____
Marvin J. Garbis
United States District Judge